UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| CAROL A. RANDALL, | ) | CIV.  07-5048-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING DECISION |
| MICHAEL J. ASTRUE, | ) | OF COMMISSIONER |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Carol A. Randall, argues that the Commissioner's decision to deny Randall disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act is not supported by substantial evidence.  This court reverses and remands the Commissioner's decision.

**FACTS**

Carol A. Randall was 50 years old on her alleged disability onset date, 54 years old when her Title II insured status expired, and 57 years old on the date of the Commissioner's final decision.  AR 288, 314.  According to her testimony, she is college-educated and has relevant work experience as a registered nurse.  AR 90-97, 125-26, 132-33, 155.  From October of 1989 to July of 1991, she worked in district Indian Health Service (IHS) clinics, with a

focus on diabetic care and education.  From 1989 to 1998, she worked primarily in nursing homes.  AR 91-96, 126.

Prior to her alleged onset of disability on January 1, 1999, Randall's history of treatment included visits for a cut on her knee in 1969, back strain from a motor vehicle accident in 1984, and asthma and bronchitis in 1986 and 1987.  AR 204, 206-07, 178, 182-84, 186, 188, 190-91, 193, 195-97, 199, 202-03.  X-rays taken in 1966 and 1976 showed spinal scoliosis.  AR 209, 211.  Randall went to the E.R. for asthma twice in October 1986, and once again in December 1986.  AR 197.  She received refills of her inhaler. AR 202.  In April 1987, doctors treated Randall's upper respiratory problems with Actified, antibiotics, and gargle solution.  AR 199.  In May 1987, a physician treated Randall with a burst of prednisone.  AR 203. In January 1991, Luis Velasco, M.D., reported laparoscopy findings in a hospital discharge summary, which diagnosed chronic pelvic pain.  AR 169.

Three months prior to Randall's alleged onset date, Dr. Steve Sachs, a Sioux San physician's assistant, reported on September 22, 1998, that Randall had fallen on the stairs at Rapid City Care Center.  AR 214-15.  He ordered lumbar x-rays, which showed lumbar scoliosis, facet sclerosis at L5-S1, and minor anterior spurring at L1-2 and L2-3.  AR 215.  Randall complained of tenderness to palpation of her right arm, but she retained good range of motion and strength.  Randall also complained of tenderness to

2

palpation of her lower back.  Randall showed no swelling or bruising; straight leg raising tests were negative; hip and lower extremity range of motion was good; strength was equal; and deep tendon reflexes were active and symmetric.  AR 214.  A partial set of limitations on that date included that she should avoid vacuuming and lifting objects such as laundry.

On October 10, 1998, Randall reported to the physician's assistant that her back "considerably improved" and bothered her "just a little bit." Examination found only mild tenderness of her lower back, and diminished strength to shoulder adduction and elbow flexion.  Physical therapy was prescribed, and Randall was told to return to full duty at work in two weeks. In addition, Randall was told to return to the doctor if she continued experiencing problems.  AR 213.

Between January 1, 1999, and December 31, 2002, Randall received medication at Rapid City Public Health Service (RCPHS) for head lice on eight occasions.  AR 246-51, 253-55.  She received pain medication on July 1, 1999, for unspecified reasons and dental treatment on May 30 and 31, 2001. AR 252, 245-46.

On September 24, 2001, Randall told RCPHS personnel that she needed papers filled out for disability and requested a disability exam.  No examination findings were recorded.  AR 232.

After December 31, 2002, the date last insured, Randall visited RCPHS complaining of a two-week history of chest pain, dizziness, and rapid heart beat in May 2003.  Examination revealed no abnormalities of the ears or chest, normal sinus rhythm of the heart, and normal EKG.  Randall was told to return for a Holter monitor.  AR 244.  She returned approximately two weeks later, stating that her chest pain came and went.  AR 241-42.  Physical examination was benign and an EKG was "essentially negative." "[A]nxiety palpitations [and] chest wall pain" were diagnosed.  Treatment included Ativan and Naprosyn.  AR 241.

Samuel Durr, M.D., reported the result of a Holter heart monitor performed on July 30, 2003.  He reported occasional premature ventricular and atrial contractions with short bursts of supraventricular tachycardia "that appeared to be asymptomatic."  Dr. Durr was also "unable to correlate symptoms of chest pain or sharp pounding feeling in her chest with any arrhythmias."  AR 220.

On May 10, 2004, Randall visited RCPHS, complaining of fatigue and diabetes.  Randall's laboratory tests were within normal limits.  AR 234.  On May 20, 2004, Randall returned; she complained of feeling tired and again requested a diabetic checkup.  The physician's assistant ordered a thyroid screen and assessed milk intolerance.  AR 234.

4

On September 24, 2004, Randall sought IHS assistance with her disability claim.  Her scoliosis and right knee pain were diagnosed and treated with Motrin.  AR 232.  On October 20, 2004, she returned for a follow-up and to document her musculoskeletal impairments.  Her cervical and thoracic spine x-rays showed "severe DJD" (degenerative joint disease); she also felt pain on palpation at C5, C6, and T4 through T8.  She was diagnosed with cervical spine DJD, chronic scoliosis, DJD of the upper thoracic spine, and right lower leg pain.  Randall was treated with Naprosyn and Tylenol.  Otherwise, examination found normal range of motion, deep tendon reflexes, and sensation.  AR 231.

In a report to the Social Security Administration dated November 1, 2004, Randall indicated that her activities included poster drawing, cleaning rooms, washing dishes, going for walks two to three times weekly, preparing meals, cleaning counters, mopping, sweeping, ironing, shopping two to three times per week, handling personal finances, reading, watching television, and visiting relatives two to three times per week.

X-rays taken on November 3, 2004, showed no abnormalities of the right leg, lumbar scoliosis with degenerative changes, and mild arthritis of the right knee.  AR 229, 228, 227.  The examination of Randall at RCPHS found some lumbar limitation of motion, apparent weakness of the right leg, and a positive straight leg raising test on the right.  Deep tendon reflexes

5

were symmetric.  AR 226.  Prednisone and Codeine were prescribed to treat pain and inflammation.  Two weeks later, Randall indicated some improvement, and her examination findings at RCPHS were essentially unchanged.  AR 223.

On January 25, 2005, Randall visited IHS, seeking treatment for low back pain, but personnel recorded no exam or treatment.  AR 222.

Terry Graber, M.D., examined Randall at the request of the Commissioner on February 17, 2005.  AR 259-68.  Randall primarily complained of low back pain, as well as pain in her elbows, knees, ankles, hips, and shoulders.  AR 262.  But range of motion of the extremities was intact; there was no muscle atrophy; deep tendon reflexes were symmetric; coordination was normal; gait was steady; and there was no tremor.  AR 264.  Her examination showed scoliosis.  AR 263.  Romberg testing was normal, and Randall could bear weight on her heels and toes.  Id.  Randall complained of pain on deep knee bending, and Dr. Graber found that she made only a partial effort.  Id.  Back x-rays showed scoliosis and some degenerative changes.  Id.; AR 266-68.  AR 264.  Dr. Graber discerned a "low likelihood" that Randall had cardiac-related chest pain.  Id.  Pulmonary function tests showed some abnormalities, which responded well to bronchodilators.  AR 264-65.  In Dr. Graber's opinion, Randall could carry 25 to 50 pounds maximum, and 10 to 20 pounds "on any kind of a frequent

basis." Additionally, he thought Randall would benefit from changing her seated position every one to two hours, and from walking and standing more frequently. Further, he thought Randall's ability to stoop, climb, kneel, and handle objects was limited; that "it would be better for her not to be exposed to dust, fumes, or temperature changes"; and that hazards were a concern due to Randall's "somewhat slow" movements. AR 264.

Thoracic spine x-rays showed "moderate" right thoracic kyphoscoliosis, diffuse thoracic spine disc narrowing, endplate sclerosis, and bridging osteophytes. AR 267. Lumbar spine x-rays showed left lumbar scoliosis with disc-narrowing at multiple levels, most pronounced at L5-S1, with "associated vacuum phenomenon and endplate sclerosis" and "bilateral facet joint narrowing." Subchondral cyst formation (an indication of more advanced osteoarthritis) was noted at the sacroiliac joints, which could relate to degenerative change. AR 266.

On March 2, 2005, Kevin Whittle, M.D., reviewed Randall's records at the Commissioner's request. Randall's impairments included chronic back pain, non-cardiac chest pain, intermittent dyspnea, right leg pain, and mild chronic obstructive pulmonary disease. AR 163. The assessment stated that Randall could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and/or sit for a total of about 6 hours in an 8-hour workday; was unlimited in push and/or pull activities other than as shown

for lifting and carrying; could frequently balance and occasionally climb, stoop, kneel, crouch, and crawl.  Also, Dr. Whittle indicated that Randall suffered no established manipulative, visual, communicative, or environmental limitations, except to avoid even moderate exposure to pulmonary irritants.  Dr. Whittle opined that Randall could perform a range of "light" work that did not require even moderate exposure to respiratory irritants.  AR 161-68.  Dr. Kristin Jensen concurred with that assessment after reviewing Randall's records on June 6, 2005.  AR 168.

On June 8, 2005, Randall received medication (Meclizine) for vertigo after she was seen at RCPHS.  AR 205, 273.  She returned on September 1, 2005, complaining of dizziness and feeling as if she would choke when she ate.  Dysphagia, dizziness, history of heart murmur in 1972, and acute sinusitis were diagnosed.  AR 272.

On October 10, 2005, Randall underwent heart tests, which found some abnormalities, including atrial septal aneurysm and patent foramen ovale.  AR 217, 219.  Randall's physicians did not restrict her activities.

In a report to the Social Security Administration dated December 2, 2005, Randall alleged an inability to stoop or stand for long, and back, spine, right leg, and lung problems.  Randall also indicated that she had stopped working on January 1, 1999, for non-disability reasons: "my disabled husband required me to be with him to care for him."  AR 125.

8

In the absence of medical explanation for her heart abnormalities, Randall interpreted her spells as psychological.  On May 26, 2006, she sought consultation for "nerves" manifesting as frequent dizzy spells, slurred speech, tinnitus, staggering, and nausea.  Vertigo, heaviness in her legs, and scoliosis were diagnosed.  She also indicated that she wanted to file for disability on the basis of back pain.  AR 270.

On June 13, 2006, Lorelee Stock, M.D., completed a functional capacities evaluation form.  Dr. Stock opined that Randall could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could sit one to two hours at a time and for two to three hours total in an 8-hour workday; could stand two hours at a time and for four hours total in an 8-hour workday; had no limitations of the feet for operation of foot controls; could occasionally reach and push/pull, frequently handle, and continuously finger and feel with both hands.  AR 281-83.  Additionally, Dr. Stock found Randall unable to climb ladders or scaffolds; could occasionally climb stairs, stoop, crouch, kneel, crawl, and balance; had no visual or hearing limitations; should avoid all exposure to moving mechanical parts; and should avoid concentrated exposure to noise, humidity, and temperature extremes.  AR 283-84.  Randall disagreed with Dr. Stock's assessment of her sitting, standing, walking, stopping, crouching, kneeling, crawling, and balancing capabilities.  AR 287.

**ALJ HEARING**

Randall applied for disability insurance benefits and supplemental security income on October 19, 2004.  She alleged disability since January 1, 1999.  Her claim was denied initially, and a request for hearing was timely filed.

A hearing before the ALJ was held on May 24, 2006.  Randall, who was not represented by counsel for purposes of the hearing, testified that she last worked in 2004 as a day laborer.  She was not participating in vocational rehabilitation.  AR 318.  She stated that she took ibuprofen, aspirin, Tylenol, and Naprosyn three or four days per week for her pain.  AR 318, 319, 328, 320.  Randall also testified that heat made her dizzy, and that cold, dampness, and humidity exacerbated her back pain.  AR 322.  She rode the bus for transportation, and the bus bothered her back when it jerked.  She alleged difficulty with buttoning buttons and handling small objects, but she also commented that she handwrote letters and the notes in the administrative record.  AR 331-32.  She further testified that she could sit for 45 minutes, stand 10 to 15 minutes, walk 200 feet, and lift and carry 15 pounds.  AR 330-31.  She had to stop four or five times when walking 20 minutes, had difficulty walking up and down stairs, and was limping more.  AR 327, 332. She could stoop once in a while and reach for things in front of

or beside her, but not overhead.  AR 333.  Randall indicated that she had
balance problems, but did not need a cane or walker.  AR 332.

Randall additionally testified that her activities included preparing
meals and sometimes walking, napping, grocery shopping, doing dishes,
making her bed, vacuuming or dusting, and watching television.  AR 321-27.
She expressed that she did not work on posters anymore, but read books and
magazines.  AR 329.  She attended pow wows and participated to a limited
extent, "just a little moving around . . . with [her] shawl."  Id.  She testified
that she visited and corresponded with friends through letter writing.  AR
329-30.  Prior to 2003, she drove five days per week.  AR 325.  Until 2003,
she babysat her daughter's children while her daughter attended school.  AR
325.

William Tysdal, a vocational rehabilitation counselor, testified as a
vocational expert at the hearing.  The ALJ's first hypothetical asked Tysdal to
consider an individual with Randall's age, education, and work experience,
and with limitations as described by Dr. Graber.  Tysdal testified that the
individual would be incapable of performing her past relevant work as a
registered nurse, but would be able to transfer work-acquired skills to
perform the jobs of school nurse, utilization review or utilization management
nurse, and medical record coder.  AR 336-37.  Tysdal also testified that
150,000 of the school nurse jobs existed in the national economy, with 1,200

11

existing in the regional economy.  AR 336.  He estimated a slight erosion by 20 percent of these positions.  With regard to the utilization review nurse position, Tysdal estimated the existence of 60,000 positions available nationally and 500 regionally with no erosion.  Id.  The medical position has 30,000 positions nationally and 400 regionally with no erosion.  Id. at 337-38.  Tysdal finally indicated that his answer would not change if an individual was limited to lifting and carrying 15 pounds occasionally and 10 pounds or less frequently.  AR 338-39.

Randall examined Tysdal.  She suggested to Tysdal that a school nurse might have to lift a sick child.  Tysdal responded that there was no such requirement, but if there were, assistance would be available.  She next expressed concern that a school nurse "has to sit at a desk all the time," and Tysdal reassured her of the flexibility of the school nurse's work: "there's [ ] sitting and standing . . . that varies."  AR 340-41.

The ALJ gave Randall the opportunity to add anything else she would like to inform him of at the close of her testimony.  She testified that she had pending physical examinations.  The ALJ allowed Randall to send reports from the examinations after the conclusion of the hearing.  AR 339-42.

## ALJ DECISION

After applying the sequential five-step evaluation process,[1] the ALJ concluded that Randall was not entitled to benefits in a written decision dated June 15, 2006.  First, the ALJ determined that Randall had not engaged in substantial gainful activity since her alleged onset date.  Second, the ALJ determined that Randall's degenerative spinal changes and back pain were "severe" under Social Security Regulations, but that her alleged knee pain, scoliosis, and lung problems were not.  Third, the ALJ found that the severity of Randall's impairments did not meet or equal a Medical Listing.  AR 17-18.

The ALJ next evaluated Randall's residual functional capacity (RFC), considering an RFC assessment from March 2005.  Accordingly, the ALJ concluded that Randall could lift and carry 15 pounds occasionally and 10 pounds frequently.  He also found that Randall could sit, stand, and walk for

---

[1] The five-step sequential analysis as outlined by the Eighth Circuit follows: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

a total of about 8 hours in an 8-hour workday, but should alternate between sitting and standing/walking every 30 to 45 minutes.  Further, the ALJ found that Randall could stoop, reach, and climb stairs occasionally, but never ladders or scaffolds.  Finally, the ALJ determined that Randall was unable to tolerate extreme cold, heat, dampness, humidity, pulmonary irritants, and workplace hazards.  Id.

In addition to medical signs and laboratory findings, the ALJ assessed Randall's subjective complaints of pain in light of the Polaski factors.[2]  The ALJ did not find Randall entirely credible because of the medical evidence and discrepancies between Randall's assertions and the information contained in the documentary reports.  The ALJ relied on medical reports indicating that although Randall stopped working after injuring her back in 1998, she had "considerably improved" by October 1998.  Additionally, the record showed that Randall stopped working for reasons unrelated to her allegedly disabling impairment: her "disabled husband required [her] . . . to care for him."  Since that time, Randall had not attempted to return to work, and she had received little medical treatment.  In her disability report, Randall reported that she only took over-the-counter medication for pain,

---

[2] The Polaski factors include: claimant's daily activities; the location, duration, frequency, and intensity of pain; and factors concerning functional limitations and restrictions due to pain or other symptoms produced by the medically determinable impairments.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

although at the hearing she asserted that she took the prescription drug Naprosyn, a non-steroidal anti-inflammatory drug to relieve arthritic symptoms. The ALJ noted that no examinations since her filing for disability relayed a finding of inflammation, swelling, redness, or warmth. Further, the ALJ considered disability evaluations demonstrating that Randall's extremities were without edema and "any real definite atrophy," despite Randall's tenderness in the elbows, back, and reports of pain in the shoulders, hips, and knees. Although Dr. Graber assessed spinal scoliosis with some degenerative changes, the ALJ noted Dr. Graeber's opinion that the x-ray changes were not extreme. AR 21.

Finally, the ALJ determined that although Randall could not perform her past relevant work as a registered nurse, she could perform other jobs existing in significant numbers in the national economy, which were consistent with her RFC, age, education, and work experience. The vocational expert testified that Randall's skills in health care, medical services, and nursing services were transferrable. Specifically, the vocational expert found that Randall could work as a school nurse, utilization nurse, or medical records coder. AR 23.

For the foregoing reasons, the ALJ concluded that Randall retained the capacity for work existing in significant numbers in the national economy, and was not under a "disability" as defined in the Social Security Act.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the record supports it as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Further, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  See also Smith v. Shalala, 987

16

F.2d at 1374.  The court must review the Commissioner's decision to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

**A.      Development of the Record**

Randall argues that the ALJ did not fulfill his heightened duty to bring forth relevant facts for an unrepresented claimant.  See Highfill v. Bowen, 832 F.2d 112, 115 (8th Cir. 1987).  The government responds that the ALJ adequately developed the record because he explored Randall's relevant medical issues and Randall waived her right to counsel at the hearing.

**1.      ALJ Exploration of Relevant Medical Issues**

Although an ALJ holds a heightened duty toward claimants who are unrepresented at the hearing, the absence of counsel does not in itself deprive a claimant of a fair hearing.  See Mitchell v. Shalala, 25 F.3d 712,

17

714 (8th Cir. 1994) (holding that the ALJ adequately developed the record because he obtained a consultative physical examination for the claimant; asked claimant about his educational level; and applied the medical and vocational guidelines for evaluating disability).  The ALJ in Randall's case not only acted as the ALJ did in <u>Mitchell</u>, but he also provided Randall with the opportunity to testify about her medical conditions, medications, activities, and limitations; to question the vocational expert; and to submit any evidence she chose.  AR 318-33, 339-41, 341-42.[3]  Therefore, the ALJ adequately developed Randall's record.

Randall argues that the ALJ failed to explore several medical issues fully, including symptoms related to atrial septal aneurysm and patent foramen ovale, leg weakness, onset date of disability, limitations resulting from asthma, and evidence relevant to her ability to perform regular and continuing employment.  The court recognizes that the ALJ could have questioned Randall more thoroughly about her right leg at the hearing.  <u>See</u> <u>Hankerson v. Harris</u>, 636 F.2d 893, 895 (2d Cir. 1980).[4]  But the ALJ only

---

[3] Although Randall contests that prehearing notices did not advise of her right to bring witnesses, the court notes that the Notice of Hearing did in fact inform Randall of this right.  AR 31.  The same notice also informed Randall of the issues and hearing procedures, that a vocational expert (whom Randall could question) would testify, and that Randall could submit additional evidence.  AR 29-31.

[4] In <u>Hankerson</u>, the court found that the ALJ did not scrupulously and conscientiously probe all relevant facts, because despite the plaintiff's passing

18

needs to develop a reasonably complete record; he is not required to function as Randall's substitute counsel.  See Clark v. Shalala, 28 F.3d 828, 831 (8th Cir. 1994).  In Clark, the court held that the ALJ did not need to inquire further as to the claimant's nonexertional impairments because substantial evidence in the record supported the ALJ's conclusion that claimant's diabetes and blood pressure were controllable.  Id.  Similarly,  Randall's record contains all the evidence that Randall listed as relevant to her claim. For example, a completed Disability Report-Adult form for the Social Security Administration, dated December 2, 2005, lists Randall's medical sources, dates of treatment, and the name of her worker's compensation attorney from 1998.  AR 124-31.  Moreover, in a Disability Report-Appeal form dated May 17, 2005, Randall wrote that she did not have additional medical sources.  AR 98-99.  Although Randall reported "increased dizziness" and "stumbling" on July 27, 2005, she only indicated a visit to Sioux San Hospital on June 8, 2005.  AR 107-08.  Thus, the court finds the ALJ developed a sufficient record regarding Randall's right leg.

Further, the ALJ was not obligated to develop evidence related to Randall's atrial septal aneurysm and patent foramen ovale because Randall

_____

references to "heart pains" and "shortness of breath," the ALJ never questioned plaintiff about his subjective symptoms.  Hankerson, 636 F.2d 893 at 895. Similarly, in this case the ALJ did not question Randall further about her right leg after she mentioned increased limping and stumbling.  AR 333.

did not allege heart impairments in her disability application or during her testimony. See Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (holding that the ALJ need not investigate claimant's depression because claimant did not allege depression in his application or at the hearing as a basis for disability). Nor was the ALJ obligated to develop evidence of Randall's estimated date of onset for spine and disc disease, where the ALJ considered Randall's allegations, her work history, and other medical evidence of her spine and disc disease. See Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006) (holding that the ALJ need not obtain expert testimony on a medically reasonable date of onset because he considered the claimant's alleged date of disability onset, work history, and other medical evidence of his condition).

Finally, Randall's education and mental competence support a finding that the ALJ met his heightened duty in developing relevant facts. Although the Eighth Circuit has not considered this factor specifically in assessing the ALJ's development of relevant facts at the hearing, the court notes the Fourth Circuit's approach. See, e.g., Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981). In Walker, the court held that the ALJ failed in her heightened duty to explore all relevant facts involving an unrepresented claimant with only four years of formal education, because the ALJ simply waited for the claimant to exhaust her barely coherent, rambling monologue before concluding, "Do you think that that about covers your problems?" Walker, 642 F.2d at 714. By

20

contrast, Randall reports graduating from college and working as a registered nurse.  Additionally, she is not mentally impaired.  AR 316, AR 90-97, 125-26, 132-33, 155.  Randall could handle her own affairs, as demonstrated by her appeal of the state agency determinations, her successful appeal of the finding that her reconsideration request was late, and her efforts to reschedule the hearing.  AR 42-44, 49-50, 146-54, 52-55, 27, 152.  Given Randall's capacity to understand and her fluid conversation with the ALJ at the hearing, the ALJ met his heightened duty in probing relevant facts with the unrepresented Randall.

### 2.    Waiver of Right to Counsel

The government correctly identifies that Randall knowingly waived her right to counsel at the hearing.  See Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).  In Wingert, the court found that the claimant knowingly waived his right to counsel, because he received a notice of his hearing clearly explaining his right to counsel.  Additionally, the claimant's reply indicated his decision to proceed pro se, as well as his reasonable grasp of regulations and procedure involved.  Id.  Similarly, Randall was advised of her right to representation and the availability of free or contingency fee-based legal services.  AR 47-48, 40-41.  On the date of the hearing, Randall

completed and signed a Right to Counsel form.[5]  Referring to this form, the

ALJ confirmed that Randall wished to proceed without representation, and

again explained her right to counsel.  AR 311-12.  Randall responded that

she "just didn't see the need for it right now."  AR 311.  Randall was

thoroughly advised of and validly waived her right to representation, thus

supporting the court's finding that the ALJ fulfilled his heightened duty to

develop the record.

**B.      Severity of Impairments**

Randall contends that the ALJ's decision did not identify all of her

"severe" impairments at step two of the sequential evaluation.[6]  An

impairment is severe when its effect has more than slight or minimal

limitations on a claimant's ability to perform basic work.  Johnston v. Apfel,

210 F.3d 870, 874 (8th Cir. 2000).  Specifically, Randall disputes the ALJ's

finding that Randall's scoliosis, mild osteoarthritis of the right knee, and

alleged lung problems were not severe.  AR 18.

The ALJ correctly determined that Randall's scoliosis was not severe.

See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).  In Dixon, the court

---

[5] This form reflected that Randall had received the letter advising her of
her right to representation, that she understood legal services could be
obtained at no cost or on a contingency fee basis, and that she wanted to
proceed with the hearing without a representative.  AR 156.

[6] The ALJ identified Randall's degenerative changes of the cervical,
thoracic, and lumbar spine to be "severe" impairments.  AR 17.

found that claimant's impairments were not severe because the claimant had worked over a period of years without any worsening of his condition.  Id. Similarly, Randall's scoliosis (which had existed since at least 1966), in addition to her other impairments, did not prevent Randall from performing medium-level work as a registered nurse until 1998.  AR 209.

The ALJ correctly found that Randall's osteoarthritis in the right knee was not severe.  First, although Randall reported on June 13, 2006, that she could not crouch or kneel without pain, nothing in the record indicates that Randall's difficulty with bending was "significant," as asserted in Randall's brief.  AR 264, 287; Pl.'s Br. at 36.  Second, Randall did not seek treatment for right knee problems during the relevant period.  Third, Randall informed treating physicians that she wanted to file for disability on the basis of back pain and not knee problems.  AR 270.  Fourth, her treating physician did not attribute any functional limitations to a knee impairment.

Finally, the record supports the ALJ's finding that Randall's lung problems are not severe.  Randall did not receive treatment for respiratory problems during the relevant period.  In addition, Dr. Graber's pulmonary function studies showed relatively mild and reversible breathing conditions. AR 264-65.  Moreover, Randall expressed at the hearing that she was not taking breathing medications or using inhalers, and no physician had limited Randall's activities due to any cardiovascular condition.  AR 320.

23

Accordingly, the court finds that the ALJ properly assessed the severity of Randall's alleged impairments.

## C.    Medical Listing

Randall argues that her spine disorders met or equaled Medical Listing 1.04.[7]  But for a claimant to show that her impairment matches a listing, the impairment must meet all of the specified medical criteria.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  Similarly, for a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, she must present medical findings equal in severity to all the criteria for the one most similar listed impairment.  Id. at 531.  Randall's medical history reflects disc and joint narrowing, a herniated disc, subchondral cysts, right leg weakness, and complaints of numbness. AR 266, 223, 226, 105, 286.  The ALJ specifically considered Medical Listing 1.04 and found that the record lacked evidence of requisite motor loss:

---

[7] Relevant elements of Listing 1.04 read:

Disorders of the Spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

Dr. Graber found range of motion for Randall's extremities "intact" and could not detect "any real atrophy."  AR 18, 263.  Additionally, objective testing and repeated physical examinations since January 1999 do not show requisite findings for nerve root or spinal cord compromise.  Further, as noted by the ALJ, no treating or examining physician stated that Randall's impairments met or equaled a listed impairment, and expert medical opinions from Dr. Jensen and Dr. Whittle refuted Randall's claim of a listing-level impairment through at least December of 2002.  AR 45, 46.  Therefore, the ALJ correctly denied Randall's allegation that she meets or equals a listed impairment.

## D.    Credibility

Randall argues that the ALJ's credibility assessment was not based upon substantial evidence and the Polaski criteria.[8]  The ALJ need not discuss each Polaski factor methodically, so long as he acknowledges and examines these considerations.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  Additionally, the court defers to an ALJ's credibility finding, as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason

---

[8] In Polaski v. Heckler, the Eighth Circuit listed factors that an ALJ should consider in evaluating a claimant's subjective complaints.  These factors include the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski, 739 F.2d 1320, 1322 (8th Cir. 1984).

for doing so.  See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).  Here, the ALJ considered the Polaski factors, as well as statutory and regulatory standards for evaluating testimony, to find Randall's testimony was not entirely credible.

The ALJ properly found Randall's testimony not entirely credible, because her subjective complaints of pain were inconsistent with the objective medical evidence.  See Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997) (holding that the claimant's complaints of disabling pain lacked credibility, where he engaged in many normal daily activities and only sought treatment for his back twice in two years).  Like the claimant in Spradling, Randall engaged in many normal daily activities, such as cleaning the house, preparing meals, and visiting relatives and friends.  Additionally, she had not returned for further treatment after improving considerably from minor injuries suffered in a fall, and she primarily took over-the-counter medication for her pain.[9]  AR 213.  Moreover, the ALJ considered doctors' opinions that Randall could perform a range of light to medium work.  AR 264, 161-68.  No physician stated that Randall's impairments precluded her from all work.  See Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006)

_____

[9] Randall additionally argues that the ALJ did not consider the entirety of her medications.  Although the ALJ did not discuss Codeine and Prednisone, the court notes the short period during which Randall was prescribed these medications (October and November 2004), as well as the fact that Randall did not address these prescriptions when prompted at the hearing.  AR 223, 226.

(finding that the ALJ could consider the fact that no physician had stated that claimant was precluded from all work in evaluating credibility). Therefore, the ALJ correctly discredited Randall's testimony.

**E.   Residual Functional Capacity**

Randall argues that the ALJ's residual functional capacity assessment was inadequate because the ALJ failed to adequately develop the record, read relevant evidence, identify severe impairments, consider her ability to perform regular and continuous employment, and properly evaluate her credibility. As discussed earlier, the court finds that the ALJ properly developed the record.  Additionally, the ALJ properly considered relevant evidence, identified severe impairments, and found her testimony not entirely credible. Therefore, the ALJ's residual functional capacity assessment is supported by substantial evidence.

**F.   Step Five Findings**

At Step Five of the disability analysis, the burden shifts to the Commissioner to show that Randall can perform work existing in substantial numbers in the national economy, given her age, education, and work experience.  Cline v. Sullivan, 939 F.2d 560, 564, (8th Cir. 1991).  The ALJ asked the VE, Tysdal, to consider an individual with the same age, education, and work experience as Randall with the following limitations: to alternate between standing and walking or sitting every half hour to 45 minutes; to

walk up or down stairs or stoop only occasionally; to never climb ladders, ropes, scaffolding; to reach above the shoulder or head only occasionally; and to not work where exposed to extreme cold, heat, dampness, humidity, or pulmonary irritants.  AR 335-36.  Tysdal testified that such a person could perform the work of a school nurse, utilization review or utilization management nurse, and medical record coder.  For the time period before Randall's date of last insured, Randall was under the age of 55.  Because the ALJ's hypothetical included only those limitations supported by the record as a whole, it was properly phrased and Tysdal's testimony constitutes substantial evidence with regard to the Title II claim.  See Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999).  Therefore, the ALJ properly relied on Tysdal's testimony with regard to the Title II claim to find that Randall's retained skills of health care, medical services, and nursing services would transfer to jobs existing in significant numbers in the national economy.  AR 23.

With regard to Randall's Title XVI claim, however, Randall was 57 years of age as of the date of the hearing before the ALJ.  If an individual is of advanced age (age 55 or older) and has a severe impairment that limits him/her to sedentary or light work, he/she is not required to make an adjustment to other work unless he/she has skills that can transfer to other skilled or semiskilled work that he/she can do despite his/her impairment.

28

20 C.F.R. § 404.156(d)(4).  Here, the ALJ found that Randall could not do her prior work, but had the following transferable skills:  health care, medical services, and nursing services.  A.R. 23.

Randall contends the more restrictive criteria for transferability, where work skills are transferable only if "very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry," is required. Rule 202.00(f), 20 C.F.R. pt. 404, subpt. P, app. 2; 20 C.F.R. § 404.1568(d)(4).  She argues that the three jobs named by Tysdal are inappropriate, because they require significant vocational adjustment and new training.

The more restrictive criteria that Randall cites, however, do not apply. Instead, where Randall was of advanced age (57 years old on the date of the ALJ's decision) but had not attained age 60, and she had severe impairments limiting her to no more than light work, the proper criteria required to find transferability come from 20 C.F.R. § 404.1568(d)(2):

(i)    The same or a lesser degree of skill is required;
(ii)   The same or similar tools and machines are used; and
(iii)  The same or similar raw materials, products, processes, or services are involved.

As a result, the burden was on the Commissioner to show that Randall had work skills that were transferable and that the same or a lesser degree of skill was required, the same or similar tools and machines were used, and the same or similar raw materials, products, processes, or services were involved.

See 20 C.F.R. § 404.1568(d)(2).  Here, the ALJ articulated the transferable skills based on Tysdal's work history sheet and Tysdal testified that the skill level for all three of the positions was the same or less than Randall's prior position of nursing.  There is no evidence in the record, however, regarding whether the same or similar tools and machines are used and whether the same or similar raw materials, products, processes, or services are involved.  Furthermore, the ALJ failed to make specific findings with respect to both of these prongs of the transferability test.  Because the record does not contain evidence regarding these two prongs, the court finds that substantial evidence does not support the commissioner's decision on the Title XVI claim.

**CONCLUSION**

Substantial evidence supports the Commissioner's conclusion on the Title II claim.  First, the ALJ adequately developed the record for an unrepresented claimant because he explored relevant medical issues and Randall waived her right to counsel for purposes of the hearing.  Second, the ALJ properly assessed the severity of Randall's impairments because Randall continued working over several years without any worsening of scoliosis, and she failed to seek treatment for her knee and lung problems during the relevant period.  Third, Randall's spine disorders do not satisfy the Medical Listings because the impairment does not meet *all* of the requisite medical criteria.  Fourth, the ALJ properly found Randall's testimony not entirely

30

credible because her subjective complaints of pain were inconsistent with objective medical evidence.  Fifth, the ALJ's residual functional capacity assessment regarding the Title II claim is supported by substantial evidence. Finally, the ALJ properly relied on the vocational expert's testimony that Randall retained skills that would transfer to work existing in significant numbers in the national economy.

Substantial evidence does not support the Commissioner's decision on the Title XVI claim, however.  No evidence was submitted, nor did the ALJ make findings, on two of the three prongs of the transferability test.

Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Carol Randall's claim for disability insurance benefits under Title II of the Social Security Act is affirmed.

IT IS FURTHER ORDERED that the Commissioner of Social Security's decision denying Carol Randall's claim for SSI under Title XVI of the SSA is reversed and this matter is remanded to the Commissioner for further hearings consistent with this opinion.

Dated July 31, 2008.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE